**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
JONESBORO DIVISION**

**LARRY ROUSE**                                                                                       **PLAINTIFF**

**v.**                      **CASE NO. 3:10CV00262 BSM**

**TENNECO AUTOMOTIVE OPERATING
COMPANY, INC., fictitiously known as
MONROE AUTO EQUIPMENT COMPANY**                   **DEFENDANT**

## ORDER

Defendant Tenneco Automotive Operating Company, Inc.'s ("Tenneco") motion for summary judgment [Doc. No. 13] is granted.

### I. FACTUAL BACKGROUND

Viewed in the light most favorable to plaintiff Larry Rouse, the nonmoving party, the undisputed facts are as follows. Rouse began working for Tenneco, a manufacturer of automobile parts, in July 2001. Defendant's Statement of Undisputed Facts ("Dfdt's SUF"), ¶¶ 1, 2. Throughout his approximately eight-year tenure with Tenneco, Rouse transferred positions twenty-five times and held sixteen different jobs. *Id.* ¶ 4. Although several of these reassignments were made at Rouse's request, Rouse was often demoted due to poor work performance and misconduct in the workplace. Ex. 5 to Dfdt's SUF. Indeed, Rouse received seventeen disciplinary actions or negative performance evaluations over approximately eight years, including reprimands for poor performance, safety violations, absenteeism, spraying a temporary employee with detergent, and sexually harassing two female co-workers. Dfdt's SUF ¶ 5; Diggs Aff. ¶ 3. Early in his career, however, Rouse was recognized for being part

of a team that produced a record number of parts during a particular shift. Weaver Dep., at 21.

Rouse asserts that much of his disciplinary record has "rolled off" because of the passing of time and that much of his poor conduct in the workplace is attributable to mental health problems and brain damage. Rouse Dep., at 51; Plaintiff's Brief, at 11, 24. Specifically, Rouse contends that he received brain injuries from an altercation with two police officers and that he suffers from undiagnosed bipolar disorder. Rouse Dep., at 39, 51. Rouse also believes that his sleep apnea further impairs his cognitive abilities. *Id.* at 57. Due to financial concerns, Rouse has not sought treatment from a neurologist or psychiatrist for these conditions. *Id.* at 52. He did, however, attend court-ordered anger management classes and more recently appeared for a psychological examination required by the Social Security Administration. *Id.* at 52-55. Rouse did not disclose his concerns about his cognitive functioning to Tenneco, and he does not believe his co-workers or management suspected that anything was wrong. *Id.* at 55. Rouse identified only one job at his former plant that would be difficult for him to perform in light of his mental conditions. *Id.* at 56.

In addition to his cognitive difficulties, Rouse has alleged that he suffers from cardiovascular, eye, and back problems. Complaint ¶ 21; Rouse Dep., at 32. Rouse's EEOC charge states that he suffered two heart attacks in 2006, but it appears that he may have only suffered from poor circulation in his legs and from varicose veins. Ex. 3 to Plaintiff's Response; Rouse Dep., at 41-51. According to Rouse, however, his cardiovascular problems are not disabling and are sufficiently managed with aspirin and nitroglycerin pills. *Id.* at 42,

46. Indeed, Rouse testified that these problems would only prevent him from working as a bushing machine operator and dirt shield welder because those jobs require a faster pace. *Id.* at 49.

As to his vision problems, Rouse contends that he requires corrective lenses but admits that he has never been to an eye doctor of any kind. *Id.* at 58. He wears glasses purchased from Walmart, and these glasses help him see better. *Id.* While performing a particular welding job, Rouse complained that he could not see out of his company-issued safety glasses and was subsequently provided prescription bi-focal safety glasses. *Id.* at 59. Rouse believes that the bi-focal safety glasses were the wrong prescription, and, although he did not complain to anyone in human resources, he did tell other Tenneco employees. *Id.*

Rouse's most serious health problem appears to be back pain. On March 13, 2006, Rouse injured his back while reaching for a part. *Id.* at 61. This was the first time Rouse had ever hurt his back, and he went to a physician on the same day complaining of a burning and tingling sensation in his back. *Id.*; Ex. 5 to Rouse Dep. He was given prescriptions for pain medication, and lumbar spine x-rays were taken at a follow up visit. Ex. 4 and 5 to Rouse Dep. Rouse returned to work almost immediately, but on light duty. Rouse Dep., at 63. Although Rouse continued to suffer from lower back pain, he did not seek further treatment or discuss the matter with Tenneco. *Id.* at 63-64.

Rouse's second back injury occurred on April 7, 2008, when he pulled on a shock that was stuck in a conveyor. *Id.* at 64; Ex. 8 to Rouse Dep. The record indicates that Rouse went to a different physician for treatment than for his first injury. Rouse Dep., at 65. Rouse

maintains that he told this second doctor he suffered from continuous back pain, but the medical records indicate that Rouse denied chronic back problems. Ex. 9 to Rouse Dep. Once again, the doctor ordered x-rays and prescribed pain medication. *Id.* It is not clear whether Rouse was returned to work with any physical restrictions. Rouse Dep., at 66.

The third incident concerning Rouse's back happened on August 7, 2009, while he was working as an order picker. Burns Dep., at 7. This position required Rouse to lift parts weighing anywhere from four to forty pounds. *Id.* at 12. It is undisputed that the workers in that department were working up to ten hour shifts, that the plant was extremely hot, and that the employees knew they should take a break if they felt they were overheating or at risk of fainting. *Id.* at 8-9; Rouse Dep., at 123. Shortly before his shift ended that day, the battery on Rouse's jack died. Rouse Dep., at 123. While Rouse was charging his jack, his supervisor, Richard Burns, approached him to ask what he was doing. *Id.*; Burns Dep., at 10. Rouse testified that he was standing by the charger and told Burns that he did not have a working jack, was tired, and that his back hurt. Rouse Dep., at 123. After Burns told Rouse to either clock out or get back to work, Rouse told Burns to "call me an ambulance." *Id.*

Burns immediately notified Harold Diggs, the plant's human resources manager, of Rouse's request and Diggs ordered Peggy Dean, the plant's occupational safety nurse, to take Rouse to the company doctor. Rouse Dep., at 124; Diggs Aff. ¶ 4. Dean asked Rouse about his back, and Rouse got angry with her for asking questions, complained about her car being too hot, and asked if he could smoke a cigarette. Dean Dep., at 8. Rouse did not appear to Dean to be in pain or struggling with his gait or posture. Ex. A to Dean Dep. After she

checked Rouse in at the doctor's office, Dean phoned Diggs to say she did not think there was anything wrong with Rouse's back. *Id.* Dean states that Rouse was asking patients for cigarettes and that the receptionists indicated that Rouse was obviously feigning his injury because he was "flopping in the chair." *Id.*

While Rouse was waiting to see the doctor, Diggs arrived in the waiting room and asked Rouse to visit with him outside. *Id.*; Diggs Aff. ¶ 4. It is undisputed that Diggs told Rouse that he suspected that Rouse's back was not injured. Rouse Dep., at 125; Diggs Aff. ¶ 4. The parties vigorously contest what happened next. Rouse contends that Diggs told him to come to work on Monday morning and that he would find another job for Rouse. Rouse Dep., at 125. Diggs maintains that Rouse wryly smiled when he suggested Rouse was feigning injury and that he interpreted the expression as if Rouse were acknowledging that Rouse's back was not injured. Diggs also asserts that Rouse happily accepted Diggs's offer to transfer him from the order picker job to another position in the plant. Diggs Aff. ¶ 4. Diggs believed that Rouse was not truly injured, but wanted a different job and to be off work that weekend. Diggs Dep., at 17. Shortly after his conversation with Diggs, Rouse returned to the plant in Dean's car without seeing the doctor, and he did not seek any medical attention for his back until after his termination on September 3, 2009. Diggs Aff ¶ 4; Rouse Dep., at 128.

Diggs and Rouse met as planned on Monday, August 10, 2009. Diggs Aff. ¶ 5. Diggs prepared a written statement providing that Rouse would receive a temporary position in the packaging department until a full-time position became available. Diggs Dep., at 13. The

statement also provided that Rouse would not be demoted again and that any misconduct would lead to termination. *Id.* Rouse worked in the packaging department for one week where he operated a piece of equipment called the Douglas machine. *Id.* He performed this temporary job satisfactorily. *Id.* at 24.

In the meantime, two permanent positions became available: a head assembly job and a welding job. *Id.* at 14. Rouse chose the welding position, at which he operated a robot welder. *Id.*; Rouse Dep., at 132. It is undisputed that Rouse performed this job poorly, but Rouse contends that it is related to the fact that he could not see the welds through his safety glasses. Diggs Aff. ¶ 6; Rouse Dep., at 132. Rouse's supervisor directed two other employees to assist Rouse with the robot welder, but his performance did not improve. Ex. 6 to Rouse Dep., at 100-01, 179-82. Rouse became increasingly hostile to his coworkers and supervisors. *Id.* Rouse was terminated on September 3, 2009, based on information from his supervisor and his performance and disciplinary history. Diggs Aff. ¶¶ 6, 7.

Rouse brings employment discrimination claims under the Americans with Disabilities Act (ADA) and the Age Discrimination in Employment Act (ADEA). He also makes passing reference to "pendent state claims based on a breach of implied contract of employment." Tenneco moves for summary judgment, asserting that no genuine issues of material fact exist and that it is entitled to judgment as a matter of law on all claims.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is proper if, after viewing the evidence in the light most favorable to Rouse, no genuine issues of material fact exist and Tenneco is entitled to judgment as a

matter of law. *Nelson v. Corr. Med. Servs.*, 533 F.3d 958, 961 (8th Cir. 2008). Rouse cannot survive the motion for summary judgment merely by pointing to disputed facts; the facts in dispute must be material to the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1985). If the facts alleged by Rouse, when viewed in the light most favorable to his case, would not allow a reasonable jury to find in his favor, then summary judgment should be granted in favor of Tenneco. *Bloom v. Metro Heart Group of St. Louis, Inc.*, 440 F.3d 1025, 1029 (8th Cir. 2006).

### III. DISCUSSION

A.      Americans with Disabilities Act

Summary judgment is appropriate on Rouse's ADA claim because he is not disabled and his employer did not regard him as disabled. Rouse argues that his back injuries, or Tenneco's perception of his back injuries, constitute a disability under the ADA, and that he was terminated because of that disability. Tenneco maintains that Rouse was neither disabled nor regarded as disabled, was not qualified to perform the essential functions of his job, and was not meeting its legitimate job expectations. In the alternative, it contends that Rouse has not shown that its proffered nondiscriminatory reason for firing him was pretextual.

To recover under the ADA, Rouse must first show that he is disabled. The ADA's definition of disability covers three different sorts of individuals: (1) those with a physical or mental impairment that substantially limits one or more major life activities; (2) those who have a record of such an impairment; and (3) those who are regarded as having such an impairment. *Norman v. Union Pac. R.R. Co.*, 606 F.3d 455, 459 (8th Cir. 2010).

To qualify as disabled under the first definition, actual impairment, Rouse must show (1) that he is "unable to perform a major life activity that the average person in the general population can perform," or (2) that he is "significantly restricted as to the condition, manner, or duration under which [he] can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." *Nyrop v. Independent School Dist. No. 11*, 616 F.3d 728, 733-34 (8th Cir. 2010). Major life activities include "'caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.'" *Id.* at 734 (quoting 29 C.F.R. § 1630.2(I)). The following three factors determine whether an individual is substantially limited in a major life activity: (1) the nature and severity of the impairment; (2) the duration or expected duration of the impairment; and (3) the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment. *Id.* (quotations omitted).

Based on the record, none of Rouse's ailments is disabling. Giving Rouse every benefit of the doubt, no reasonable jury could find that his cardiovascular, visual, or cognitive problems restrict or significantly affect his ability to perform major life activities. Rouse himself testified that none of these conditions would prevent him from performing almost any job at Tenneco. Furthermore, there is virtually no medical evidence of the existence and severity of these maladies.

Rouse's back condition, however, presents a somewhat closer question. This is

because Rouse is restricted, at least to some degree, in lifting heavy objects, and lifting is "part of a set of basic motor functions that together represent a major life activity." *Breitkreutz v. Cambrex Charles City, Inc.*, 450 F.3d 780, 783 (8th Cir. 2006). The key question is whether Rouse's back injury renders him unable to perform "the set of manual tasks that are of central importance to most people's daily lives." *Id.* Even after viewing the evidence in the light most favorable to Rouse, and giving him the benefit of every possible inference, no reasonable jury could answer that question in the affirmative.

Moreover, Rouse's case is weaker than the cases presented by other plaintiffs in this district who have failed to satisfy the ADA's definition of disability. For example, in *Whiten v. Stuttgart Reg'l Med. Ctr.*, the plaintiff produced medical evidence of arthritis in her knee that restricted her ability to work more than eight hours at a time. No. 5:07CV000026 SWW, at 6 (Doc. No. 47), 2008 WL 229763, at *3 (E.D. Ark. Jan. 28, 2008). The court reasoned that the plaintiff's demonstrated ability to continue working following her diagnosis counseled against a finding of disability. *Id.* at 7, 2008 WL 229763, at *4. The Eighth Circuit summarily affirmed the adverse grant of summary judgment. *Whiten v. Stuttgart Reg'l Med. Ctr.*, 333 Fed. App'x 138 (8th Cir. 2009) (per curiam).

Rouse's medical records do not provide objective medical evidence of a chronic back condition. Instead, it appears that Rouse received three discrete injuries during his last three years at Tenneco. After each injury, he promptly returned to work with few or no restrictions, working in physically demanding jobs for long hours in difficult circumstances. He sought no treatment aside from worker's compensation and social security health

examinations. For these reasons, Rouse's back problems do not restrict the condition, manner, or duration under which he can perform a particular major life activity as compared to the average person in the general population, and he is not disabled under the ADA.

Additionally, the record is devoid of evidence from which a reasonable jury could infer that Tenneco regarded Rouse as disabled. To the contrary, the record shows that Rouse's supervisors thought he was perfectly healthy and often exaggerated his discomfort to avoid performing certain tasks or working certain shifts. Because Rouse does not meet any of the statutory definitions of disability, summary judgment is granted in favor of Tenneco on Rouse's ADA claim.

B.       Age Discrimination in Employment Act

Summary judgment is appropriate on Rouse's ADEA claim because he cannot show that Tenneco's proffered reason for his discharge was pretextual. Rouse was forty-eight years old when he filed his charge of discrimination with the EEOC. The only allegation in his complaint germane to this claim is that several Tenneco employees called him "old man" once or twice a week during the last three years of his tenure with the company. He further argues that the testimony of one of these individuals, Rick Weaver, establishes that it was possible to "set up" an employee working the robot welder for termination by not properly calibrating the machine prior to that employee's shift. Tenneco maintains that Rouse cannot make out a *prima facie* case of age discrimination under the ADEA. In the alternative, it contends that Rouse has not shown that its proffered nondiscriminatory reason for firing Rouse was pretextual.

Under the ADEA, an employer may not discriminate against persons forty years or older because of their age. 29 U.S.C. § 623(a). To prevail, a plaintiff "must show, by a preponderance of the evidence, that age was the "but-for" cause of the challenged adverse employment action." *Haigh v. Gelita USA, Inc.*, 632 F.3d 464, 468 (8th Cir. 2011). Stray remarks in the workplace, such as the "old man" barbs at issue here, do not constitute direct evidence of age discrimination under the ADEA. *Ramlet v. E.F. Johnson Co.*, 507 F.3d 1149, 1153 (8th Cir. 2007). Therefore, Rouse's claim will be analyzed according to the burden shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Haigh*, 632 F.3d at 468.

Under *McDonnell Douglas*, Rouse must first make out a *prima facie* case of age discrimination by showing: (1) he was at least 40 years old; (2) he was terminated; (3) he was meeting Tenneco's reasonable expectations at the time he was terminated; and (4) he was replaced by an individual who was substantially younger. *Id.* (citing *Roeben v. BG Excelsior Ltd. P'ship*, 545 F.3d 639, 642 (8th Cir.2008)). If Rouse establishes a *prima facie* case, the burden of production shifts to Tenneco to articulate a legitimate, nondiscriminatory reason for the termination. *Id.* Finally, if Tenneco provides such a reason, Rouse must prove, by a preponderance of the evidence, that Tenneco's reason was mere pretext for discrimination. *Id.*

Tenneco argues that Rouse cannot satisfy the third element, meeting reasonable expectations, because of his lengthy disciplinary record and numerous job changes. Although Rouse was obviously not a model employee, a reasonable jury could find that he "possesses

11

the basic skills necessary" to work at Tenneco's plant. *See McGinnis v. Union Pacific R.R.*, 496 F.3d 868, 874 (8th Cir. 2007). Therefore, for the purposes of this motion, Rouse can establish the third element of his *prima facie* case.

It is not clear whether Tenneco replaced Rouse with a substantially younger individual. Indeed, in the four pages of Rouse's brief devoted to his ADEA claim, there is only one conclusory reference to his *prima facie* case. Instead, Rouse focuses on his cognitive impairments and alleges a general conspiracy on the part of Tenneco's management. For the sake of making a clear record and because Tenneco produced a nondiscriminatory reason for Rouse's discharge, namely that Rouse performed his job poorly, the analysis will continue.

Rouse can demonstrate a material question of fact regarding pretext in one of two ways: (1) by showing that Tenneco's proffered explanation is "unworthy of credence . . . because it has no basis in fact," or (2) by using comparators to show that Rouse's age was the actual reason for his discharge. *See Torgerson v. City of Rochester*, 643 F.3d 1031, 1047 (8th Cir. 2011). Tenneco asserts that it fired Rouse simply because of poor work performance. Despite Rouse's belief that management conspired against him by placing him in a situation that would ensure his failure, there is ample factual support in the record for Tenneco's explanation. Furthermore, Rouse has not come close to meeting his burden of identifying a comparator "similarly situated in all relevant respects" whose misconduct was of a "comparable seriousness" to that of himself. *See Smith v. Allen Health Systems, Inc.*, 302 F.3d 827, 835 (8th Cir. 2002); *Lanear v. Safeway Grocery*, 843 F.2d 298, 301 (8th Cir.

1988). Accordingly, Rouse has failed to identify triable issues of fact as to his age discrimination claim, and summary judgment is therefore appropriate.

C.     Breach of Implied Contract

In paragraph one of his response to the pending motion, [Doc. No. 20] Rouse makes passing reference to "pendent state claims based on a breach of implied contract of employment." He does not provide any explanation or argument on a contract claim, and Tenneco does not address one in its motion or reply. Indeed, although a similar reference can be found in his complaint, Rouse did not set out his breach of implied contract claim in a separate count, and he also did not include any factual allegations that could give rise to such a claim. Accordingly, to the extent that Rouse actually seeks relief under a contract theory, summary judgment is granted in favor of Tenneco.

IV. CONCLUSION

For all of the reasons set forth above, Tenneco's motion for summary judgment [Doc. No. 13] is granted, and the relief sought is denied. An appropriate judgment shall accompany this order.

IT IS SO ORDERED this 4th day of April 2012.

_____
UNITED STATES DISTRICT JUDGE